IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

GOLD CROSS EMS, INC.,           *
                            *
        Plaintiff,         *
                            *
    v.                     *         CV 113-081
                            *
THE CHILDREN'S HOSPITAL OF     *
ALABAMA,                     *
                            *
        Defendant.         *

## O R D E R

This case comes before the Court following the settlement of various negligence claims against both Gold Cross EMS, Inc. ("Gold Cross" or "Plaintiff") and the Children's Hospital of Alabama ("Children's" or "Defendant"). The underlying action involved an accident where a two-year-old girl was paralyzed after her stretcher tipped over during transport to Children's. Gold Cross settled the suit and filed the instant action seeking contribution from Children's and alleging breach of a joint defense agreement. The Court now considers Children's motion for summary judgment (Doc. 43), and for the reasons stated herein, that motion is **GRANTED IN PART AND DENIED IN PART.**

## I. BACKGROUND

**A.   Factual Background**

On March 4, 2009, Zia'Kiera Threatts ("Threatts"), a two-year-old burn victim, was transferred from Doctor's Hospital of Augusta to Children's following the discovery of a heart condition. (Doc. 25 ("Compl.") ¶¶ 12-13, 17.) While transporting Threatts from the ambulance at Doctor's Hospital to the plane, her stretcher tipped over and Threatts was paralyzed from the waist down. (Doc. 54 ¶ 13.) Two lawsuits were brought alleging negligence against Gold Cross and Children's by Threatts's father and her guardian ad litem, and all claims were eventually settled. (Doc. 44, Ex. 12 ("Bell Dep.") at 76; Doc. 60.) Specifically, Gold Cross settled all underlying tort claims for $9 million,[1] but reserved the right to seek contribution from Children's. (Id.; Doc. 54 ¶ 24; Doc. 60.)

Sometime prior to March 4, 2009, the date of Threatts's transfer, Doctor's Hospital contacted Dr. Leslie Hayes[2] — a pediatric critical care specialist — to see if she would agree to care for Threatts. (Doc. 44, Ex. 1 ("Hayes Dep.") at 10-14.) Dr. Hayes then contacted Laura Demmons, UAB's transport

---

[1]    Children's did not participate in the settlement, though the settlement did extinguish its liability for the underlying tort claims. (Doc. 54 ¶ 25.)

[2]    Dr. Hayes works at both University of Alabama Birmingham ("UAB") and Children's. (Hayes Dep. at 9-10.)

coordinator, to arrange transport.[3]  (Doc. 53, Ex. 2; Doc. 44, Ex. 2 ("Demmons Dep.") at 21.)  Ms. Demmons in turn contacted Gold Cross to arrange for ambulance transport for Threatts from Doctor's Hospital to the airport.  (Doc. 53, Ex. 2.)  After the travel arrangements were in place, Children's sent two employees to Augusta to oversee Threatts's treatment — Suzanne Key, a nurse, and Michael Mardis, a respiratory therapist.  (Doc. 53, Ex. 2; Doc. 44, Ex. 4 ("Key Dep. I") at 19-20.)  The ambulance was driven by Gold Cross employees Alima Mims and Jacques A. Johnson.  (Doc. 44, Ex. 8 ("Mims Dep.") at 39-41.)

It is undisputed that during transport Key and Mardis remained responsible for all of Threatts's medical care.[4]  (Key

---

[3]     UAB and Children's "have a joint dispatch.  The transport coordinator on duty takes requests and dispatches transports for both" hospitals. (Demmons Dep. at 10.)  According to Ms. Demmons, UAB would receive any bills relating to the transport (for example, from Gold Cross) and would in turn bill Children's for the services rendered.  (Id. at 32-33.)

[4]     According to Children's, its transport policy requires deference to ambulance staff in transport matters, leaving only the medical care in its control.  (Doc. 44, Ex. 14 at Ex. A ("Peterson Aff.")) ("As the style of ambulance stretcher and loading mechanisms/procedures varies with out-of-town ambulances, the medical team shall assist the local ambulance crew as directed.").)
        Consistent with Children's policy, Vince Brogdon, CEO of Gold Cross, stated that Gold Cross was responsible for securing the sled to the stretcher, loading the stretcher, and unloading the stretcher.  (Doc. 44, Ex. 7 at 39.)  In fact, Alima Mims, one of the Gold Cross employees involved in this matter, testified that he was not working under the direction of Children's, but that "we're working up under Gold Cross, because we're not doing any patient care, so our only job is to transport the patient" and that they did not rely on the Children's employees to assist with pulling the stretcher out of the ambulance.  (Mims Dep. at 64-65.)  Gold Cross contends that even though it was responsible for transport, senior medical staff — here Ms. Key — was in control of the entire process.  (See Key Dep. I at 45-46.)  Bolstering this view, Key stated in her deposition that she, as the nurse, could have told Mims and Johnson to stay away and unload the stretcher herself and that she would have expected them to heed her request, but "[t]hat's not what we do."  (Key Dep. I at 46.)

Dep. I at 29-41.) In fact, the Children's team took custody of Threatts at the hospital, put her on a transport ventilator, retained control of the IV and medication, and placed Threatts into a child seat attached to a "sled,"[5] both of which were brought with Key and Mardis on the trip. (Id.) The sled locked into a stretcher, which was provided by Gold Cross. (Id. at 31-33.)

Following the initial medical exam, Threatts, Key, Mardis, and the two Gold Cross employees made their trip to the airport.[6] (Key Dep. I at 23-25, 36.) Key and Mardis rode in the back of the ambulance with Threatts, who was chemically paralyzed and sedated, and the Gold Cross employees were in the front of the ambulance. (Mims Dep. at 52; Key Dep. I at 39.) Upon their arrival at the airport, Mims and Johnson exited the ambulance and proceeded to remove the stretcher. (Key Dep. I at 39; Mims Dep. at 53-54.) Key also exited the ambulance at this time, but Mardis stayed inside to ensure all tubing remained connected as the stretcher was removed. (Key Dep. I at 39-40.) It was at this time that the stretcher tipped over. (Mims Dep. at 54.) Immediately thereafter the stretcher was uprighted, though it is

---

[5] The sled is used to attach the child seat to an adult-sized stretcher. (Key Dep. I at 35.)

[6] According to Mims, when he and Johnson arrived at the burn unit in Doctor's Hospital, Threatts was already strapped into the car seat, which was attached to the sled. (Mims Dep. at 47.) Mims and Johnson then "put the actual board onto our stretcher and [used] our straps to further secure the baby." (Id.)

unclear from the record whether all four individuals lifted the stretcher or whether Mims and Johnson did so alone. (Compare Key Dep. I at 46 (suggesting that all four individuals assisted) with Mims Dep. at 54 (claiming that Mims and Johnson uprighted the stretcher).) Once the stretcher was upright, Key and Mardis checked the functioning of all tubes and medication, Threatts was put onto the aircraft where she could be secured and any injuries assessed, and then Threatts, Key, and Mardis traveled to Birmingham.[7] (Doc. 44, Ex. 5 ("Key Dep. II") at 41; Key Dep. I at 63.) Approximately two days after the accident, a CT scan revealed a hematoma on Threatts's spine. (See Hayes Dep. at 51-52.)

Following the accident, the two aforementioned lawsuits were filed against Gold Cross and Children's ("the underlying litigation"). Throughout the underlying litigation, Gold Cross and Children's maintained separate defense strategies, but the two did agree to share expert witnesses as co-defendants. (Doc. 54 ¶ 18; Doc. 53, Ex. 7.) Additionally, following an oral conversation, Children's sent Gold Cross a letter via e-mail proposing that the two negotiate jointly with the plaintiff.

---

[7]     It is unclear from the record who was involved in putting Threatts onto the plane. In Key's second deposition, she states that she, Mardis, and the two Gold Cross employees lifted the stretcher from outside the airplane and the pilots slid it up and made sure it locked into place. (Key Dep. II at 42-43.) However, Mims testified that after they uprighted the stretcher the flight nurse (Key) told them to get out of the way. (Mims Dep. at 60, 65.) And Johnson testified that Key and Mardis loaded the baby for transport following the fall. (Doc. 44, Ex. 9 ("Johnson Dep.") at 37.)

(Doc. 53, Ex. 7.) In that proposal, Children's and Gold Cross agreed not to enter *pro tanto* settlements or high/low agreements with the plaintiff, and they agreed not to disclose the contents of the letter. (Id.) With the letter, Children's provided a scale that delineated the portion of any settlement Children's would cover if the settlement exceeded $7.5 million. (Id.) A formal joint defense agreement, however, was never reduced to writing. (Doc. 54 ¶ 19.) During the pendency of settlement discussions, an e-mail was disclosed by counsel for Children's to Threatts's counsel that included the range of settlement options listed in the above-mentioned proposal. (Compl. ¶¶ 35-38.) And although Threatts's attorney testified that the e-mail had no impact on the valuation of his client's claim, Gold Cross claims this breach led to a higher settlement than would have been reached otherwise.[8] (Bell Dep. at 106-08.)

## B. Procedural Background

Gold Cross filed the instant complaint in the State Court of Richmond County, which Children's removed to this Court on

---

[8]   Gold Cross's insurer additionally said the following when asked about the impact of the e-mail on a decision to settle:

> It made a decision — well, it didn't at that point in time, because we felt like we were in a situation that, if we did lose, we would be on the hook for bad faith. So we felt that the decision at that point was to avoid the risk and avoid the risk to our insured of an excess verdict.

(Doc. 44, Ex. 13 ("Carleton Dep.") at 59-61.)

May 17, 2013. (Doc. 1.) In its complaint, Gold Cross alleges that Children's owes it contribution from the settlement and that Children's breached a joint defense agreement. (Doc. 25 (Gold Cross Amended Complaint).)

Following Gold Cross's complaint, Children's filed its answer and counterclaims for (1) attorney's fees and expenses and (2) medical expenses written off by Children's for Threatts's care. (Doc. 4.) Children's then filed the current motion for summary judgment on April 3, 2014 (Doc. 43). Gold Cross, in its response, asks this Court to *sua sponte* grant partial summary judgment in its favor on the issue of contribution liability, finding either that (1) Children's owed a non-delegable duty with respect to the child's transport or (2) Mims and Johnson were solely or jointly under the control of Children's at the time of the accident. (Doc. 53.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party,

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor." *U.S. v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) and *Celotex*, 477 U.S. 317). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Jones v. City of Columbus*, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory

statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk gave Plaintiff appropriate notice of the motion for summary judgment and informed it of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 46.) Therefore, the notice requirements of <u>Griffith v. Wainwright</u>, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied.

## III. DISCUSSION

In its motion for summary judgment, Children's seeks judgment as a matter of law regarding both of Gold Cross's claims: (1) contribution; and (2) breach of the oral joint defense agreement. Additionally, and in the alternative to denying this motion, Gold Cross asks this Court to *sua sponte* find Children's liable for contribution.[9] The Court addresses each of Children's claims in turn.

### A. Contribution

Under Georgia law, claims for contribution are governed by O.C.G.A. § 51-12-32:

> [W]here a tortious act does not involve moral turpitude, contribution among several trespassers may be enforced just as if an action had been brought against them jointly. Without the necessity of being charged by action or judgment, the right of a joint

---

[9] Given the rulings contained herein, the Court need not address this position.

> trespasser to contribution from another or others
> shall continue unabated and shall not be lost or
> prejudiced by compromise and settlement of a claim or
> claims for injury to person or property or for
> wrongful death and release therefrom.

O.C.G.A. § 51-12-32(a). And although Georgia no longer allows contribution where the *jury* apportions damages among those liable based on a percentage of fault, this apportionment statute does not abolish the right of contribution from a settling party. See Zurich Am. Ins. Co. v. Heard, 740 S.E.2d 429, 432 (Ga. Ct. App. 2013) ("[I]t cannot be interpreted to abolish the right of contribution between settling joint tortfeasors when there has been no apportionment of damages by a trier of fact."). Thus, the Court recognizes that it *may*, apportionment statute notwithstanding, award contribution if warranted.

"Clearly, an action for contribution and indemnification is an action for negligence." Dep't of Transp. v. Montgomery Tank Lines, Inc., 575 S.E.2d 487, 490 (Ga. 2003). As such, Gold Cross makes several allegations of negligence against Children's that it believes supports contribution: (1) failing to supervise Threatts's transport, (2) failing to care for Threatts during transport and after the fall, and (3) failing to disclose the fall and its role in Threatts's paralysis. As the Court reads Gold Cross's complaint, it bases its claim for contribution on

two overarching theories: (1) vicarious liability and (2) independent acts of negligence subsequent to Threatts's fall.

### i. Vicarious Liability

An employer will be held vicariously liable for the torts committed by independent contractors in only limited circumstances. As relevant to the present action, an employer is liable for the negligence of a contractor: "(4) if the wrongful act is the violation of a duty imposed by statute" or "(5) if the employer retains the right to direct or control the time and manner of executing the work or interferes and assumes control so as to create the relation of master and servant or so that an injury results which is traceable to his interference[.]" O.C.G.A. § 51-2-5. With this statute as the guide, Gold Cross asserts three theories of vicarious liability to support its claim for contribution, each of which the Court summarizes briefly.

First, Gold Cross avers — as Threatts did in the underlying tort action — that Children's is a common carrier and thus owed a non-delegable statutory duty to Threatts. See O.C.G.A. § 46-9-132 ("A carrier of passengers must exercise extraordinary diligence to protect the lives and persons of his passengers but is not liable for injuries to them after having used such diligence."); Bricks v. Metro Ambulance Serv., Inc., 338 S.E.2d

12

438, 441 (Ga. Ct. App. 1985) (holding that an ambulance may be a common carrier). Indeed, the parties spend a considerable portion of their briefs addressing whether Children's qualifies as a common carrier.

Next, Gold Cross claims that the two ambulance drivers, Mims and Johnson, were either borrowed or joint servants and thus under the control of Children's. In Georgia, the borrowed servant doctrine is based in statutory law: "If the bailor sends his own agents with the thing bailed, the hirer shall not be liable for the acts of such agents but shall only be liable either to the bailor or to third persons for the consequences of his own directions and for gross neglect." O.C.G.A. § 44-12-62(b); see also Underwood v. Burt, 364 S.E.2d 100, 102 (Ga. Ct. App. 1987) ("By definition, a borrowed servant is, at least temporarily, the actual employee of the 'borrowing employer.' For example, the borrowing employer would presumably bear vicarious liability for the acts of the borrowed servant precisely because those acts are performed for his benefit and under his direction and supervision."). Georgia law additionally recognizes the concept of "joint servants," where the employees are subject to the control of multiple masters. Merry Bros. Brick & Tile Co. v. Jackson, 171 S.E.2d 924, 926 (Ga. Ct. App. 1969) (holding that "[o]rdinarily, one is not the servant of two masters, but the courts of this State have

recognized the principle that one may be the servant of two masters and subject to the demands of both or either" and listing cases that say the same).

Finally, Gold Cross argues that Children's was engaged in a joint venture with Gold Cross at the time of the incident. See Clarendon Nat'l Ins. Co. v. Johnson, 666 S.E.2d 567, 571 (Ga. Ct. App. 2008) (recognizing joint venture as a possible theory of vicarious liability); Williams v. Chick-fil-A, Inc., 617 S.E.2d 153, 155 (Ga. Ct. App. 2005) ("A joint venture arises where two or more parties combine their property or labor, or both, in a joint undertaking for profit, with rights of mutual control (provided the arrangement does not establish a partnership), so as to render all joint venturers liable for the negligence of the other . . . . For a joint venture to exist, there must be not only a joint interest in the purpose of the enterprise . . . but also an equal right, express or implied, to direct and control the conduct of one another in the activity causing the injury.") (citations omitted). Here, Gold Cross alleges that Children's had the right to control the unloading of the stretcher at the time of the accident and that the two entities were combining their property and labor in an undertaking for profit.

The Court need not decide, however, if Children's would be vicariously liable under any of these theories, as Georgia law

is clear that "a negligent employee and his vicariously liable employer are not 'joint tortfeasors' in the classic sense, in that the employer has committed no separate and distinct act of negligence and the employee has no right of contribution against his employer." Gay v. Piggly Wiggly S., 358 S.E.2d 468, 471 (Ga. Ct. App. 1987); see also PN Express, Inc. v. Zegel, 697 S.E.2d 226, 233 (Ga. Ct. App. 2010) ("Thus, where a defendant employer's liability is entirely dependent on principles of vicarious liability, such as respondeat superior, then unless additional and independent acts of negligence over and above those alleged against the servant or employee are alleged against the employer, a verdict exonerating the employee also exonerates the employer." (internal quotation marks and citations omitted)); St. Paul Fire & Marine Ins. Co. v. MAG Mut. Ins. Co., 433 S.E.2d 112, 113 (Ga. Ct. App. 1993) (quoting with approval the proposition from Gay stated above); Flynn v. Reaves, 218 S.E.2d 661, 663 (Ga. Ct. App. 1975) ("Thus, defendant [w]hose negligence, if any, was actual, cannot seek contribution from his co-partners, who are merely constructively negligent.").

As detailed above, theories based on common carrier, joint and borrowed servant, and joint venture are all means of imposing vicarious liability on an employer. Because Gold Cross does not allege that Children's was actively negligent in the

removal of the stretcher — but rather asserts that Children's either owed a non-delegable duty in transport or retained control over Mims and Johnson — any claims for contribution based on these vicarious liability theories must fail as a matter of law.

### ii. Independent Act of Negligence

Although Gold Cross does not allege that Children's was independently negligent in the removal of the stretcher, its complaint does not limit its claim for contribution to vicarious liability alone. In the complaint, Gold Cross alleges that Children's was subsequently negligent in failing to properly care for Threatts during transport, failing to disclose the fall and its role in Threatts's paralysis, and failing to properly care for the child subsequent to her fall. (Compl. ¶ 29.) In support of these allegations, Gold Cross asserts that Children's initially took the position that Threatts's paralysis was of an unknown origin and did not disclose the fall to the child, "her parents, her guardian ad litem, or her foster parents[.]" (Id. ¶ 22.) Moreover, Gold Cross alleges that Children's "was additionally jointly and severally liable to the plaintiffs in the Tort Action along with Gold Cross because its negligent failure to timely disclose the incident to medical personnel at

its hospital facility caused or contributed to [Threatts's] injuries." (Id. ¶ 27.)

As a preliminary matter, the Court seriously questions whether Gold Cross may raise such a claim. Throughout the underlying litigation, Gold Cross did not challenge the characterization of Children's liability as vicarious. Children's, Gold Cross, Children's Careflight, Alima Mims, and Jacques Johnson were sued in tort by April L. Logan, Threatts's guardian ad litem, and Dwight Williams, Threatts's father, on September 13, 2011 and June 11, 2012, respectively. A revised pre-trial order dated October 24, 2012 in the Logan matter recognized the only liability issue — at least as it pertained to Children's — was "[w]hether Children's is vicariously liable for the negligent acts of the employees of Gold Cross, Alima Mims and Jacques A. Johnson." (Doc. 44, Ex. 10 at ¶ 8.) This order was never signed by the state court judge and the parties settled just a week later, but both Gold Cross and Children's agree that the issues before the court in the underlying litigation — at least as to Children's — were limited to vicarious liability. (Doc. 54 ¶ 20.)

Gold Cross's deposition of Threatts's counsel, John C. Bell, Jr., is also telling. In that deposition, (1) Bell agreed with Gold Cross's characterization that the "live issue" for trial, as it related to Children's liability, was the joint

control/borrowed servant position (Doc. 44, Ex. 12 at 70-71); (2) Bell stated that he did not pursue a medical malpractice case or have any experts opine that if treatment had been initiated sooner there might have been a different outcome in terms of Threatts's paralysis (Id. at 90-91); (3) Bell "never abandoned the theory that legally [he] had a legitimate argument that either Mims and Johnson were, quote, borrowed servants and under some indicia of control" (Id. at 92-93); and (4) Bell based the claim against Children's on vicarious liability and a joint servant theory and did not have "any experts who were prepared to testify or testified that there was any substandard care while at Children's" (Id. at 120).

Finally, in the underlying action, Children's moved for summary judgment or a stipulation that liability as to Children's was limited to vicarious liability.[10] In a hearing on the matter, Judge Booker openly questioned why such a motion or stipulation would be necessary when Threatts never raised a claim of malpractice or independent negligence. (Doc. 44, Ex. 11 at 219-222.) In fact, when the court raised this concern, Threatts's attorney responded "Absolutely," and Gold Cross remained silent. (Id.) This review of the record demonstrates that at no time did Gold Cross assert that Children's engaged in

---

[10]    This motion and its subsequent hearing were prior to the third revised pretrial order, wherein the parties all agreed that Children's was subject to only vicarious liability.

any act of independent negligence; rather, it recognized Children's liability was derivative in nature. Now Gold Cross asks this Court to allow for contribution based on allegations that Children's was actively negligent, when at every stage in the underlying litigation it not only failed to object to the characterization of Children's liability but affirmatively agreed with it, as in the revised pre-trial order.

Even assuming Gold Cross could assert a claim based on an independent act of negligence, Gold Cross has failed to allege any facts that would support a finding of independent negligence by Children's. A negligence claim requires the plaintiff to show the existence of some duty, breach of that duty, causation, and damages. _Johnson v. Am. Nat'l Red Cross_, 578 S.E.2d 106, 108 (Ga. 2003). In fact,

> [o]n the issue of the fact of causation, as on other issues essential to the cause of action for negligence, the plaintiff, in general, has the burden of proof. The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to grant summary judgment for the defendant. Likewise, it is a well settled principle of negligence law that the occurrence of an unfortunate event is not sufficient to authorize an inference of negligence.

_Christopher v. Donna's Country Store_, 511 S.E.2d 579, 580 (Ga. 1999) (internal citations and quotation marks omitted).

Gold Cross, in its complaint, only claims that (1) the fall at the airport was the cause of a swollen spinal cord and epidural hematoma that resulted in paralysis, (2) Children's did not discover the injury until two days after Threatts was admitted to Children's, and (3) Children's took the position that the paralysis was of an unknown origin and did not disclose the injury to Threatts, her guardian, her parents, or her foster parents. (Compl. ¶¶ 20-23.) In conclusory fashion, Gold Cross states that Children's improperly cared for Threatts following her fall and also failed to disclose the role of the fall in her paralysis. Gold Cross does not affirmatively point to any facts supporting how Children's improperly cared for Threatts or how the failure to timely disclose the role of the fall impacted the paralysis. Instead, in its brief, Gold Cross focuses exclusively on the level of control exercised by Children's at the scene of the accident. To support that assertion, Gold Cross presents deposition testimony from Mims and Johnson that the choice to take Threatts straight to Birmingham after the fall and not go to a local trauma center was made by the Children's nurse.[11] (See Mims Dep. at 75; Johnson Dep. at 37.)

However, merely stating that Children's "negligent failure to timely disclose the incident to medical personnel at its

---

[11]    Although Gold Cross cites these in reference to the issue of whether Children's exercised control and is thus subject to vicarious liability, the Court reviews this evidence as related to the issue of delayed care.

hospital facility caused or contributed to [Threatts's] injuries" (Compl. ¶ 27) is insufficient to withstand a motion for summary judgment as it does nothing to demonstrate causation, but instead provides pure speculation as to the causal relationship.[12] As to the aforementioned deposition testimony, simply showing that Threatts was taken to Birmingham instead of a hospital in Augusta in no way demonstrates that Children's in fact caused the paralysis or any aggravation thereof. In the underlying tort action, Threatts's counsel did not have any experts that would testify that Children's engaged in any sort of professional or ordinary negligence or that the time delay made any difference in Threatts's condition, and Gold Cross does not present any contradictory facts now.[13]

As such, Gold Cross has "failed to meet [its] burden of pointing to specific evidence showing that [Children's] caused

---

[12] As described above, in a motion for summary judgment, where the moving party presents evidence that affirmatively negates a material fact, the non-movant must respond with evidence sufficient to withstand a directed verdict. See Fitzpatrick, 2 F.3d at 1116. Through Bell's deposition, detailed above, Children's has demonstrated an absence of evidence relating to causation. Thus, the burden shifts to the non-movant (1) to show that the record contains evidence "overlooked or ignored" by Children's or (2) to "come forward with additional evidence sufficient to withstand a directed verdict[.]" Id. at 1117. For the reasons described herein, Gold Cross has not met this burden.

[13] Although Bell does state that he believes the time lapse in discovery of the spinal injury made a difference (Bell Dep. at 90-91), he freely admits that he had no expert to support that claim, and Gold Cross has presented none in its complaint or subsequent filings. (Id. at 120 (Bell responding in the negative when asked if he had "any experts who were prepared to testify or testified that there was any substandard care while at Children's).) In fact, Bell had a pediatric neurologist who testified that the care Threatts received was "excellent" at Children's. (Id. at 112.)

[the] injuries." See Christopher, 511 S.E.2d at 580. These allegations, even when taken in the light most favorable to Gold Cross "are merely conclusions and are probative of nothing." See id. (quoting Wilkes v. Kroger Co., 470 S.E.2d 506, 507 (Ga. Ct. App. 1996)). Based upon the foregoing, Gold Cross's claim for contribution must fail as a matter of law.


## B.    Joint Defense Agreement

Gold Cross next alleges that Children's breached a joint defense agreement when it "negligently disclos[ed] to counsel for [Threatts] confidential settlement authority discussions between and among the Tort Action Defendants." (Compl. ¶ 35.) According to Gold Cross, this joint defense agreement was made orally between Gold Cross's and Children's counsel and was "fiduciary in nature, where each party placed trust and confidence in the other and promised mutually to cooperate, support and defend each other with respect to any and all claims by [Threatts] in the Tort Action." (Id. ¶ 34.) Children's contends, however, they did not reach an agreement with Gold Cross, and even if an agreement was reached there were no damages resulting from a breach.

There is scant authority in this jurisdiction regarding joint defense agreements. Georgia courts have, however, recognized joint defense agreements within the framework of a

common interest privilege, which "applies where (1) the communication is made by separate parties in the course of a matter of common interest; (2) the communication is designed to further that effort; and (3) the privilege has not been waived. The privilege does not require a complete unity of interests among the participants, and it may apply where the parties' interests are adverse in substantial respects." McKesson Corp. v. Green, 597 S.E.2d 447, 452 n.8 (Ga. Ct. App. 2004) (quoting United States v. Bergonzi, 216 F.R.D. 487, 495 (N.D. Cal. 2003)). Here, it is unclear whether Gold Cross is attempting to assert a breach of fiduciary duty claim based on the confidential nature of the privilege or a breach of contract claim. However, because Georgia courts recognize the concept in terms of a privilege and seemingly not a contract, this Court will do so as well. Id.; see also United States v. Stepney, 246 F. Supp. 2d 1069, 1079 (N.D. Cal. 2003) ("Joint defense agreements are not contracts which create whatever rights the signatories chose, but are written notice of defendants' invocation of privileges set forth in common law.").

A claim for breach of fiduciary duty requires proof of three elements: "(1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach." Bienert v. Dickerson, 624 S.E.2d 245, 248 (Ga. Ct.

App. 2005) (quoting Griffin v. Fowler, 579 S.E.2d 848, 850 (Ga. Ct. App. 2003)).

This Court assumes, without deciding, that a fiduciary duty attaches upon invocation of the privilege. See Westinghouse Elec. Corp. v. Kerr-McGee Corp., 580 F.2d 1311, 1319 (5th Cir. 1978)[14] (recognizing "[w]hen information is exchanged between co-defendants and their attorneys in a criminal case, an attorney who is the recipient of such information breaches his fiduciary duty if he later, in his representation of another client, is able to use this information to the detriment of one of the co-defendants, even though that co-defendant is not the one which he represented in the criminal case" as a "fairly common situation[] where, although there is no express attorney-client relationship, there exists nevertheless a fiduciary obligation"); Wilson P. Abraham Constr. Corp. v. Armco Steel Corp., 559 F.2d 250, 253 (5th Cir. 1977) ("In such a situation, an attorney who is the recipient of such information breaches his fiduciary duty if he later, in his representation of another client, is able to use this information to the detriment of one of the co-defendants."); ABA Formal Op. 95-395 ("[A] lawyer would almost surely have a fiduciary obligation to the other members of the [joint defense] consortium, which might well lead

---

[14]   See Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981) (holding Fifth Circuit decisions made on or before September 30, 1981, are binding precedent in Eleventh Circuit).

to his disqualification."); see also Maplewood Partners, LP v.
Indian Harbor Ins. Co., 295 F.R.D. 550, 564, 605-14 (S.D. Fla.
2013) (recognizing documents revealing information about
settlement value or options in a joint defense agreement are
privileged even without a written joint defense agreement where
the parties assigned tasks to various attorneys consistent with
the privilege); Nat'l Med. Enter. v. Godbey, 924 S.W.2d 123, 130
(Tex. 1996) (quoting Westinghouse for the proposition that an
attorney would breach the fiduciary duty by revealing
confidential information).[15]  But see United States v. Almeida,
341 F.3d 1318, 1326 (11th Cir. 2003) (holding "when each party
to a joint defense agreement is represented by his own attorney,
and when communications by one co-defendant are made to the
attorneys of other co-defendants, such communications do not get
the benefit of the attorney-client privilege in the event that
the co-defendant decides to testify on behalf of the government
in exchange for a reduced sentence" and "confidential
communications made during joint defense strategy sessions are
privileged[,] [but a] duty of loyalty, however, does not exist
in this situation and it is therefore improper to conclude that
all of the attorneys in the joint defense strategy session
represent all of the participating defendants"); Travelers Cas.

---

[15]   The Court notes that these cases almost exclusively relate to an
attorney's fiduciary duty, and neither party has addressed the issue of
whether that duty can be imputed to Children's, through agency or other legal
principles.

& Sur. Co. of Am. v. Highland P'Ship, Inc., No. 10-cv-2503, 2011 WL 4381629, at *3 (S.D. Cal. Sept. 20, 2011) (holding that fiduciary relationships are characterized by the vulnerability of one party and the empowerment of another).

On a motion for summary judgment, Children's can only succeed by either negating an essential element of Gold Cross's case or by showing there is no evidence to prove a fact necessary to the case. In its motion, Children's makes two arguments: (1) no such agreement existed between Gold Cross and Children's and (2) even if the agreement exists, there was not a breach.

Addressing whether the privilege or any agreement existed, Children's asserts that (1) its common interest was limited to resolving the matter with the smallest monetary contribution possible and (2) Gold Cross has failed to present any evidence that a joint defense agreement was in place. However, it is well established under Georgia law that the existence of an oral agreement is a question of fact for the jury. Turner Broadcasting Sys., Inc. v. McDavid, 693 S.E.2d 873, 877-78 (Ga. Ct. App. 2010). Children's conclusory assertions that (1) no such agreement existed and (2) the common interest, if any, was extremely limited are insufficient to warrant summary judgment on this critical issue of fact. Children's also attempts to satisfy its burden by pointing to Gold Cross's alleged failure

to present evidence in support of the existence of an agreement. However, in light of the e-mail correspondence between the parties regarding the settlement proposal — which references an undescribed, prior conversation — and Gold Cross's claim that the agreement was oral, fiduciary in nature, and based in mutual cooperation and defense, the Court disagrees. As demonstrated by the McKesson case, whether the common interest privilege has even been invoked is a fact-intensive inquiry dependent on the content of the communication and whether an agreement was made in furtherance of a common interest. McKesson Corp., 597 S.E.2d at 452 n.8; Cochran v. Five Points Temporaries, LLC, No: 2:10-cv-3522, 2012 WL 4726285, *6-11 (N.D. Ala. Sept. 27, 2012) (analyzing a written joint defense agreement that detailed the privilege, the confidentiality of communications, and the sharing of documents with outside parties, but ultimately holding that the plaintiff failed to show that confidential information was exchanged during the agreement). Thus, a question of fact remains as to whether the privilege was fully invoked and, if so, the scope of that privilege.

Children's has similarly not presented sufficient evidence to negate the third element of breach of fiduciary duty: damage proximately caused by the breach. Children's provides the testimony of John Bell and Jay Carleton to support its claim that Gold Cross was not harmed by any breach. Bell testified

27

that the disclosure of the e-mail had nothing to do with his valuation of the case (Bell Dep. at 106-08) and Carleton, a representative of Gold Cross's insurer, stated that the settlement decision was driven by a desire to avoid a potential bad faith claim from the insured (Carleton Dep. at 59-61). The Court does not find this sufficient to warrant judgment as a matter of law. A review of Carleton's testimony, for example, reveals that the e-mail, while it did not impact the decision to settle, did have some impact on the value of that settlement. (Carleton Dep. at 59 ("Once the E-mail trail went through and Bell discovered that there were probably additional funds remaining to resolve the case, we felt that we were in a situation there that, you know, the plaintiff was aware that there was additional money to settle the case.").) In fact, Georgia law recognizes a claim for bad faith against an insurer that fails to pay the policy limit to settle catastrophic injury cases. See S. Gen. Ins. Co. v. Holt, 416 S.E.2d 274, 276 (Ga. 1992) (holding that where the evidence showed that liability for an accident was clear and damages exceeded the policy limits, a question of fact existed as to whether an insurance company acted in bad faith by refusing to settle). Thus, drawing all inferences in Gold Cross's favor, the Court cannot hold as a matter of law that the breach did not result in damages to Gold Cross.

Accordingly, genuine issues of fact remain as to whether the privilege was ever invoked and, assuming an agreement does exist, whether breach of that agreement proximately caused Gold Cross's damages. Thus, summary judgment in Defendant's favor is improper at this juncture.

## IV. CONCLUSION

For the reasons set forth above, Defendant Children's Hospital of Alabama's motion for summary judgment (Doc. 43) is **GRANTED IN PART AND DENIED IN PART.** This case shall proceed to trial on all remaining claims.

**ORDER ENTERED** at Augusta, Georgia, this _____ day of January, 2015.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA